## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **NASON CONSTRUCTION, INC.** | : | CIVIL ACTION |
| 3411 Silverside Road | : | |
| Tatnall Building, Suite 200 | : | |
| New Castle County | : | |
| Wilmington, DE 19810, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **BEYNON SPORTS SURFACES, INC.** | : | |
| 16 Alt Road | : | |
| Baltimore County | : | |
| Hunt Valley, MD 21030, | : | |
| | : | |
| Defendant. | : | NO. _____ |

## COMPLAINT

Plaintiff Nason Construction, Inc., by and through its attorneys, hereby files this Complaint against Defendant Beynon Sports Surfaces, Inc., and alleges in support thereof as follows:

## NATURE OF THE ACTION

1.      This action is for breach of contract to recover costs due to delays in the Critical Path of the Substantial Completion of a construction project at the University of Maryland Eastern Shore ("UMES") in Princess Anne, Maryland.

## PARTIES

2.      Plaintiff, Nason Construction, Inc. ("Nason"), is a Pennsylvania corporation with its principal place of business at 3411 Silverside Road, Tatnall Building, Suite 200, Wilmington, New Castle County, Delaware.

3.      Defendant, Beynon Sports Surfaces, Inc. ("Beynon"), is a Maryland corporation with its principal place of business at 16 Alt Road, Hunt Valley (*a.k.a.*, Cockeysville), Baltimore County, Maryland.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship between Plaintiff and Defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      This Court has personal jurisdiction over Defendant because Beynon Sports Surfaces is a Maryland corporation with its principal place of business in Hunt Valley, Maryland, and the construction project from which this lawsuit arises was located in Princess Anne, Maryland.

6.      Venue is proper in the District of Maryland pursuant to: (a) 28 U.S.C. § 1391(b)(1) because Defendant Beynon has its principal place of business in and is a resident of the State of Maryland; and (b) 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred within this District.

## FACTUAL BACKGROUND

### A.      Nason's Contract to Resurface the UMES Track

7.      Nason entered into a contract with UMES dated June 17, 2015, for the "Renovation / Resurfacing of the Outdoor Track—Cappy Anderson Stadium—University of Maryland Eastern Shore, Princess Anne, MD" (the "UMES Track Project").  UMES / Nason Contract (**Ex. A hereto**).

8.      The total contract amount of the UMES Track Project was $2,297,000 (without change orders), Substantial Completion of the work on the Project was to be within 120 calendar days, and the contract provided for Liquidated Damages of $500 per calendar day that Substantial Completion went beyond the 120 days.  UMES / Nason Contract, Art. 2 (**Ex. A hereto**).

9.      The notice to proceed was issued on July 17, 2015, making the targeted Substantial Completion date November 14, 2015.

10.     The UMES Track Project involved a number of different components:  It involved removing the existing track; installing an underground water retention and irrigation system; sodding the interior of the track; seeding the exterior of the track; pouring concrete for a sidewalk around the track, a new pole vault runway, and shotput and hammer rings; installing a new scoreboard; and paving the track and long-jump area with asphalt.

11.     After the track and long-jump area had been paved and the concrete components had been poured, the track and other surfaces were to be surfaced with a polyurethane synthetic material and then striped.

12.     The specifications for the Project were set so that the new track and field would meet National Collegiate Athletic Association ("NCAA") specifications.

13.     NCAA specifications are tight, they are important, and they had to be met for every element of the Project, especially the track.

14.     Nason is a construction management company, meaning it retains and coordinates various subcontractors to do the different components of the work to be performed on a construction project.

15.     For the UMES Track Project, Nason retained a number of different subcontractors to perform the different components of the Project, including the synthetic surfacing and striping.

**B.      Beynon's Subcontract to Surface the Track**

16.     Beynon entered into a subcontract with Nason dated June 24, 2015, for $477,983 (without change orders).  Nason / Beynon Subcontract ("N/B Subcontract") ¶ 4.1 at 3 (**Ex. B hereto**).

17.     The Scope of Work in the subcontract involved two basic parts, both of which were in the Critical Path of the UMES Track Project: (1) applying a synthetic surfacing to the asphalt track and other areas to be surfaced (long jump area, pole vault runway, and shotput and hammer rings); and (2) painting all the striping and other markings on the synthetic surfacing.  N/B Subcontract, Scope of Work, Ex. B (**Ex. B hereto**).

## C.     The Specifications for the UMES Track Project

18.     Paragraph 1.1 of the N/B Subcontract provides that the Subcontract Documents include the Prime Contract between UMES and Nason, "including without limitation . . . specifications (a list of the drawings and specifications is included as Exhibit A—List of Drawings and Specifications) . . . ."  N/B Subcontract ¶ 1.1 at 1 (**Ex. B hereto**); *see also id*. Art. 40 at 21 (List of Drawings and Specifications incorporated and made part of the Subcontract).

19.     Exhibit A to the N/B Subcontract is the List of Construction Drawings / Specifications and includes: "Specification and General Requirements for Renovation/Resurfacing of the Outdoor Track Sections 01100 – 16000."  N/B Subcontract, Ex. A (**Ex. B hereto**).

20.     The Scope of Work for the N/B Subcontract likewise provides that Beynon was required to "[p]rovide all submittals as per specification section 02540, ~~02230, 02513T~~, 02539, 02542."  N/B Subcontract, Ex. B at 2 (**Ex. B hereto**).

21.     The process and procedure for submitting submittals was outlined in Specification 01330, which provides 12 pages on exactly how to generate and submit a proper submittal.

22.     Specification 01330, like all the specifications for the UMES Track Project, was incorporated into and made a part of the N/B Subcontract.  N/B Subcontract ¶ 1.1 at 1, Art. 40 at 21 & Ex. A (**Ex. B hereto**).

23.     Section 02540 of the Specifications governs "Track & Field Synthetic Surface." Spec. 02540 (**Ex. C hereto**).

24.     Among other things, Part 1.4 of Section 02540 governs Submittals and provides that a submittal must be made for all patching material:

> A.     The following information **must be submitted** by the Track & Field Synthetic Surfacing Contractor **prior to installation**. . . .
>
> 6.     Standard specification and application for recommended subbase primers, crack filler, **patching and leveling material**. . . .
>
> 8.     Material safety data sheets ["MSDS sheets"] on all individual components of the product being installed.

Spec. 02540, Pts. 1.4.A.6 & 1.4.A.8, at 1-2 (emphasis added) (**Ex. C hereto**).

25.     Part 2.1 of Section 02540 further provides:

> E.     **Patching Material**: All materials **must be approved** materials and compatible with the synthetic surface.

Spec. 02540, Pt. 2.1.E, at 5 (emphasis added) (**Ex. C hereto**).

26.     As a result, and in addition to all the other specifications that were made a part of the N/B Subcontract, Beynon agreed to and was contractually obligated to: (a) make a submittal for any patching material it intended to use; (b) submit MSDS sheets for any such material; and (c) get approval for using such material before using it.

### D.     Beynon Used Loctite as a Patching Material

27.     The Beynon surfacing for the UMES track has two layers, both of which are polyurethane blends: (a) the **force-reduction layer**, or base layer, which is the bottom layer and goes directly onto and adheres to the asphalt; and (b) the **wearing layer**, or top layer, onto which

polyurethane granules (colored EPDM rubber) are broadcast before the wearing layer cures so that they adhere to it.

28.     The force-reduction layer is applied first and cures before the wearing layer is applied.

29.     Beynon has, with other tracks it has surfaced, had issues with water percolating through the force-reduction layer and causing the wearing layer to bubble.

30.     Bubbles in the surface can present serious risks to runners and other athletes using the surfaced areas and they constitute a defect in Beynon's work that has, on other projects, required Beynon to perform corrective action.

31.     This results in square or rectangular patches in the track.

**E.     Beynon's Use of Loctite Caused Project Delays**

32.     After Beynon set the force-reduction layer at the UMES track, it found water percolating through and/or reacting with that layer of the surfacing.

33.     On its own initiative, Beynon cut out the portions of the force-reduction layer showing water penetration or reaction, vacuumed out any residual water, and patched the voids with Loctite Polyurethane Roof & Flashing Sealant ("Loctite").

34.     Prior to using the Loctite, Beynon had not: (a) made a submittal for using the Loctite; (b) made a submittal with the MSDS sheets for the Loctite; and/or (c) gotten the approval to use the Loctite.

35.     The Loctite Beynon used is black and all three components of Beynon's surfacing materials—the force-reduction layer, the wearing layer, and the granules—are red.

36.     As a result, Beynon's use of Loctite as a patching material was readily apparent to Edward Johnson, P.E., UMES's Project Manager on the job.

37.     On October 27, 2017, Mr. Johnson sent an email to Josh Bullard, Nason's Superintendent on the job, directing him to have all the Loctite caulk removed and replaced with the approved force-reduction material.

38.     Mr. Johnson further instructed Mr. Bullard: "Do not install the wearing surface over the Loctite caulk."

39.     Nason communicated Mr. Johnson's directive to Beynon, but Beynon declined to follow Nason's directive from Mr. Johnson.

40.     Robert Toland, Nason's Project Manager on this job, wrote to Mr. Johnson summarizing Beynon's position as follows:

> Here is Beynon's response to your email:
>
> 1.  They have used this on countless tracks and the Loctite caulk provides a far better water seal than just using force reduction material;
>
> 2.  The use of the Loctite caulk has no impact on the performance of the track;
>
> 3.  UMES needs to allow Beynon to proceed and do its work without these perennial stops—they are the experts in track surfacing and they need to be allowed to do their job;
>
> 4.  They will not engage in more conference calls, which is why I am outlining their thoughts in this email;
>
> 5.  They will not remove the Loctite caulk from the force reduction layer because there is no reason to remove it and because it is being used for a reason—because it provides a better water seal than is provided by just using more of the force reduction material; and
>
> 6.  If UMES cannot allow Beynon to proceed with the Loctite caulk where it is and use it as Beynon deems appropriate to best protect UMES's interest in not having water bubbles / blisters—based on Beynon's years of experience and knowledge of how best to surface a track—Beynon will seek payment for what it has done and leave.

41.     These were Beynon's words and Beynon's position, not Nason's words or position even though Nason's Project Manager was the messenger.

42.     On October 28, 2017, Mr. Johnson wrote George Brotherston, P.E., retained as a supervisory Project Manager by Nason's surety.

43.     Mr. Johnson explained that UMES's position was that "[t]he methods and materials being utilized recently with Loctite roof sealant are not acceptable."

44.     The letters and emails from UMES on the use of Loctite not being acceptable, however, was not a stop work order.

45.     As a result, Beynon finished the surfacing, applying the wearing layer over all the patching it had done with Loctite, forever concealing where the Loctite had been used.

46.     Beynon was set to do the striping of the track on November 6, 2017.

47.     But UMES and Beynon were at an impasse—UMES would not accept the surfacing because Beynon applied the wearing layer over the patching it had done with Loctite, and Beynon would not do the striping until UMES accepted the surfacing.

48.     As a result, Beynon and UMES were at loggerheads with Nason in the middle:

     a.     Beynon believed it knew what was best, regardless of what the job specifications required, *versus*

     b.     UMES knew what the job specifications required, yet Beynon proceeded to ignore the specifications as well as UMES's directive not to apply the wearing layer over the Loctite patching material it had used.

49.     The synthetic surfacing and striping were in the Critical Path of the Substantial Completion of the UMES Track Project. (The "Critical Path" in a construction project is the sequence of tasks or work in a project that are critical to maintaining the project's targeted completion date.

- 8 -

Meaning, if there is a delay in a task that is in the Critical Path, that delay will necessarily result in a delay in the completion of the overall project.)

50.     As a result, Beynon's use of Loctite as a patching material—without submitting it for approval, without submitting the MSDS sheets for it, and without getting approval for its use—delayed the completion of UMES Track Project by suspending / interrupting / stopping the Critical Path of the Substantial Completion of the Project.

51.     Much back-and-forth took place from October 28, 2017, to February 2, 2018, about the use of Loctite and whether its use compromised the track surfacing.

52.     On February 2, 2018, Jackie Collins, the Director of the Office of Procurement at UMES, wrote to Mr. Brotherston and explained that UMES would not accept the surfacing over asphalt that contained moisture (because Beynon did not allow it to cure sufficiently) or over the Loctite.

53.     Attached to Ms. Collins's letter was a diagram showing the portions of the track surface that UMES was demanding be removed and replaced, which was roughly two-thirds of the track.

54.     The remainder of the surfaced area would be under a "wait-and-see review" until July of 2018, meaning the entirety of all surfaced areas might have to be removed and replaced.

### F.     Beynon's Performance Bond

55.     Pursuant to the N/B Subcontract, Beynon was required to secure performance and payment bonds for its work on the UMES track.

56.     Pursuant to that obligation, Beynon secured performance and payment bonds from Federal Insurance Company / Chubb Group of Insurance Companies ("Chubb") for $477,983.

57.     Due to UMES's position that much (and potentially all) of the surfacing was required to be removed and replaced, Nason sent a letter to Beynon's surety, putting it "on notice that to the extent Beynon does not do the corrective work outlined in the February 2, 2018, letter, Nason intends to declare Beynon in default under its Subcontract and demand that Federal Insurance Company fulfill its obligation under the Performance Bond."

58.     On February 7, 2018, Beynon gave Mr. Toland a quote for the cost of removing and resurfacing that part of the track that had been delineated in the diagram from Ms. Collins for a cost of $262,455.

59.     This was a cost for which Beynon expected to be paid—as opposed to being covered under its contract—and the quote "does not include patching or replacement of any asphalt damaged during the removal process due to the track surfaces adherences to the existing sub-strate."

60.     In reality, the asphalt under the surfacing would have been destroyed by removing the surfacing and the cost of doing what UMES had ordered would have cost well over $1 million, meaning that a good deal of money was riding on the fact that UMES had rejected the surfacing and had ordered it to be removed and replaced.

### G.     Nason Persuades UMES to Accept the Synthetic Surfacing

61.     There was, again, a huge volume of back-and-forth between Nason, Beynon, UMES, Nason's surety, Chubb, the Maryland Attorney General's office (UMES being a State University), and others.

62.     Ultimately, a meeting was held at UMES on April 9, 2018, with all the involved players—23 individuals around a collection of tables.

63.     Michael Zisa, Esquire (Nason's surety's attorney) and Mr. Toland explained how and why UMES should accept the surfacing with the Loctite caulk used as a patching material.

64.     Messrs. Zisa and Toland were at that meeting arguing Beynon's case for it and for Chubb under the Performance Bond so that they could avoid having to remove and replace most if not all the surfacing.

65.     Mr. Toland had been doing this for months before that meeting and months afterwards.

66.     Much back-and-forth again took place after this meeting between UMES, the Attorney General's office, Nason, and Beynon.

67.     Ultimately, through Nason's hard work, UMES agreed to accept the track surfacing with the Loctite caulk having been used as a patching material and without Beynon having to remove and replace any of it.

###     H.     Beynon Used the Wrong Paint for Striping

68.     Specification 02542 titled "Track & Field Line Markings" governs the striping and other markings that Beynon subcontracted to paint on the UMES Track Project.

69.     Part 2.1.A of Specification 02542 provides: "[t]he paint is a polyurethane based paint used on Track & Field Synthetic Surface."  Spec. 02542, Pt. 2.1.A (**Ex. D hereto**).

70.     This requirement was reiterated in the Scope of Work attached to the N/B Subcontract.  N/B Subcontract, Ex. B at 2 (**Ex. B hereto**) ("The paint will be polyurethane based used on Track and Field Synthetic Surface.").

71.     Instead of using a polyurethane based paint to paint the striping and other markings on the track and other surfaces, Beynon (actually, Beynon's sub-subcontractor) began the striping with a Sherwin Williams Metalatex semigloss paint.

72. This was discovered after the striping had begun, at which point it would be impossible to remove the incorrect paint that had been applied and apply the correct polyurethane paint.

73. The striping and other markings on the track and other surfaces were in the Critical Path of the UMES Track Project.

74. Beynon's use of the wrong paint for the striping and other markings on the track and other surfaces—without submitting it for approval and without getting approval for its use—delayed the completion of UMES Track Project by suspending / interrupting / stopping the Critical Path of the Substantial Completion of the Project.

## I.   The Terms and Conditions of the N/B Subcontract

75. Under the terms and conditions of the N/B Subcontract, Beynon agreed to pay Nason for the costs of any delays, disruptions, hinderances, obstructions, or interferences with the completion of the UMES Track Project caused by Beynon or any of its officers, agents, servants, employees, subcontractors, or suppliers.

76. Under the terms and conditions of the N/B Subcontract, Beynon agreed to pay Liquidated Damages in the amount of $500.00 per day for any delays to the UMES Track Project caused by Beynon or any entity or person retained by Beynon or for whose acts Beynon may be liable.

77. Under the terms and conditions of the N/B Subcontract, Beynon agreed to pay Nason for its costs and attorney's fees in this dispute and its costs and attorney's fees leading up to this lawsuit.

78. Under the terms and conditions of the N/B Subcontract, mediation is a mandatory condition precedent to further dispute resolution, *i.e.*, this lawsuit.

79.     Nason and Beynon underwent mediation through the American Arbitration Association on May 27, 2020.  The mediation did not resolve this dispute.

**COUNT I**
**BREACH OF CONTRACT:**
**<u>BEYNON'S USE OF LOCTITE</u>**

80.     The foregoing allegations are incorporated herein as if set forth in full.

81.     "[T]o state a claim for breach of contract, a plaintiff need only allege the existence of a contractual obligation owed by the defendant to the plaintiff, and a material breach of that obligation by the defendant."  *RRC Ne., LLC v. BAA Maryland, Inc.*, 994 A.2d 430, 442 (Md. 2010); *see also WSC/2005 LLC v. Trio Ventures Assocs.*, 190 A.3d 255, 267 (Md. 2018) ("To prove breach [of contract], a plaintiff must simply show that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." (internal quotations omitted)).

82.     Beynon entered into and was under contract with Nason to, among other things, surface the track at UMES and to paint the striping and other markings on the track surfacing.

83.     The N/B Subcontract incorporated Section 02540 of the Specifications for the UMES Track Project, which required that: (a) all patching and leveling material to be used by the Track & Field Synthetic Surfacing Contractor, Beynon, must be submitted prior to being used; (b) MSDS sheets for all components of the products being installed be submitted prior to being used; and (c) all patching materials had to be approved before they could be used.

84.     On or about October 2, 2017, Beynon began surfacing the UMES track and other areas to be surfaced.

85.     On or about October 21, 2017, Beynon began cutting out portions of the force-reduction material and used Loctite to patch the cutout areas.

86. On or about October 27, 2017, Mr. Johnson at UMES rejected Beynon's use of Loctite as a patching material and directed Nason to remove all the areas with Loctite and replace it with the approved force-reduction material.

87. Nason instructed Beynon to remove all the areas with Loctite and resurface it with the approved force-reduction material.

88. Beynon declined to do that.

89. On or about October 28, 2017, Mr. Johnson at UMES wrote to Mr. Brotherston and stated that Beynon's use of Loctite was "not acceptable."

90. On or about February 2, 2018, Ms. Collins at UMES wrote to Mr. Brotherston and advised him that UMES would not accept the surfacing Beynon had installed and directed him to have roughly two-thirds of it removed and replaced.

91. The Loctite that Beynon used on the UMES track was a "patching material."

92. Beynon never submitted the identity, specifications, and/or MSDS sheets for the Loctite before using it nor did it ever receive approval of the Loctite before using it.

93. Beynon's failure to submit the identify, specifications, and/or MSDS sheets for the Loctite before using it, as well as using the Loctite as a patching material before having it approved, constitutes a material breach of contract.

94. Beynon's refusal to obey the directive to remove the Loctite before applying the top / wearing layer of the surfacing, but instead applying the wearing layer on top of the force-reduction layer with Loctite in it—thereby forever concealing where the Loctite had been used—constitutes a material breach of contract.

95. Because UMES would not accept the track surfacing with the Loctite used as a patching material, Beynon would not paint the striping and other markings on the surfacing.

- 14 -

96.     A significant delay in the Critical Path of the UMES Track Project was caused by: (a) Beynon's material breach of contract by using the Loctite without first identifying it, submitting its MSDS sheets, and getting approval for its use; (b) Beynon's subsequent material breach of contract by refusing to remove the Loctite as directed; and (c) Beynon's subsequent material breach of contract by refusing to paint the striping and other markings on the surfacing material because UMES would not accept the surfacing material due to Beynon's use of Loctite.

97.     Beynon's material breach of contract by using Loctite as a patching material was the but-for and proximate cause of a significant delay in the Critical Path of the Substantial Completion of the UMES Track Project.

98.     That significant delay in the Critical Path of the Substantial Completion of the UMES Track Project was the but-for and proximate cause of significant damages to Nason.

99.     *Ergo*, Beynon's material breach of contract by using Loctite as a patching material was the-but for and proximate cause of significant damages to Nason.

100.    Those damages include, but are not limited to, the following:

   a.     Nason's Liability for Liquidated Damages to UMES;

   b.     Beynon's Responsibility for Liquidated Damages under the Subcontract;

   c.     Nason's Extended General Conditions for the periods of delay;

   d.     Nason's personnel costs, attorney's fees, and other costs fighting the battle for Beynon and ultimately persuading UMES to accept Beynon's surfacing with the Loctite and without having to remove it and replace it; and

   e.     Nason's Attorney's Fees and Costs of this lawsuit, the mediation, and all the prior work leading up to this litigation.

101.    Nason's damages in this case exceed $500,000.00.

- 15 -

**WHEREFORE**, Plaintiff Nason Construction, Inc., respectfully requests that a judgment be entered in its favor and against Defendant Beynon Sports Surfaces, Inc., for all damages caused by the delay due to Beynon's material breach of contract by using Loctite Polyurethane Roof & Flashing Sealant as a patching material without first submitting it as an intended product to be used, submitting the MSDS sheets for the product, and securing the approval to use the material before proceeding to use it, together with all costs and attorney's fees.

## COUNT II
## BREACH OF CONTRACT:
## BEYNON'S USE OF THE WRONG PAINT

102.    The foregoing allegations are incorporated herein as if set forth in full.

103.    Beynon entered into and was under contract with Nason to, among other things, paint the striping and other markings on the track and other surfaces.

104.    The N/B Subcontract incorporated Section 02542 of the Specifications for the UMES Track Project, which provides: "[t]he paint is a polyurethane based paint used on Track & Field Synthetic Surface."

105.    On or before August 8, 2018, Beynon began painting the striping and other markings on the UMES track and other surfaces using the wrong paint—a Sherwin Williams Metalatex semigloss paint.

106.    On or about August 9, 2018, Nason wrote to Beynon and explained that: (a) Beynon was using the wrong paint for the striping and other markings; (b) Mr. Johnson at UMES was on vacation at that time; (c) it would be impossible to remove the wrong paint without destroying the surfacing; (d) that by continuing to paint the striping and other markings with the wrong paint, Beynon was proceeding at its own risk; and (e) that "any delays or cost associated with these issues [the use of the wrong paint] will be Beynon's responsibility."

107.     Ultimately, UMES accepted the striping and other markings with the wrong paint, but Beynon's use of the wrong paint caused delays in the Critical Path of the UMES Track Project because it delayed UMES accepting the track.

108.     Beynon's use of a Sherwin Williams Metalatex semigloss paint for the striping and other markings was a material breach of contract given that the specifications called for the use of "polyurethane based paint used on Track & Field Synthetic Surface."

109.     Beynon's material breach of contract by using a Sherwin Williams Metalatex semigloss paint for the striping and other markings instead of a polyurethane based paint caused a significant delay in the Critical Path of the Substantial Completion of the UMES Track Project.

110.     Beynon's material breach of contract by using the wrong paint was the but-for and proximate cause of a significant delay in the Critical Path of the Substantial Completion of the UMES Track Project.

111.     That significant delay in the Critical Path of the Substantial Completion of the UMES Track Project was the but-for and proximate cause of significant damages to Nason.

112.     *Ergo*, Beynon's material breach of contract was the but-for and proximate cause of significant damages to Nason.

113.     Those damages include, but are not limited to, the following:

   a.     Nason's Liability for Liquidated Damages to UMES;

   b.     Beynon's Responsibility for Liquidated Damages under the Subcontract;

   c.     Nason's Extended General Conditions for the periods of delay;

   d.     Nason's personnel costs, attorney's fees, and other costs fighting the battle for Beynon and ultimately persuading UMES to accept Beynon's surfacing with the Loctite and without having to remove it and replace it; and

      e.      Nason's Attorney's Fees and Costs of this lawsuit, the mediation, and all the prior work leading up to this litigation.

114.    Nason's damages in this case exceed $500,000.00.

**WHEREFORE**, Plaintiff Nason Construction, Inc., respectfully requests that a judgment be entered in its favor and against Defendant Beynon Sports Surfaces, Inc., for all damages caused by the delay due to Beynon's material breach of contract by using a Sherwin Williams Metalatex semigloss paint instead of a polyurethane based paint as called for in the UMES Track Project specifications, together with all costs and attorney's fees.

COHEN SEGLIAS PALLAS
GREENHALL & FURMAN PC

 /s/ Jackson S. Nichols
JACKSON S. NICHOLS
Dist. Md. Bar No. 19689
900 Seventh Street, NW
Suite 725
Washington, DC 20001
202-466-4110 (tel)
202-466-2693 (fax)
jnichols@cohenseglias.com

*Counsel for Plaintiff,*
*Nason Construction, Inc.*

Dated:  August 10, 2020

## <u>CERTIFICATE OF SERVICE</u>

I, Jackson S. Nichols, Esquire, certify that a true and correct copy of the foregoing

Complaint was caused to be sent to the following via Federal Express on August 10, 2020:


Beynon Sports Surfaces, Inc.
Attn. John T. Beynon, President
16 Alt Road
Hunt Valley, MD 21030



_/s/ Jackson S. Nichols_____
JACKSON S. NICHOLS


Dated:  August 10, 2020